IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE JADE GROUP, INC., a Colorado corporation, JADE WR INC., a Colorado corporation, B & C TRANSMISSIONS, LLC, a South Carolina limited liability company, and CDL TRANSMISSION, LLC, a South Carolina limited liability company, | : : : : : : : : : |

CIVIL ACTION
No. _____

Plaintiffs,

v.

COTTMAN TRANSMISSION
CENTERS, LLC, a Delaware limited
liability company, AMERICAN
DRIVELINE SYSTEMS, INC., a
Delaware corporation, and GLOBAL
POWERTRAIN SYSTEMS, LLC, a
Delaware limited liability company,

Defendants.

## COMPLAINT

Plaintiffs The Jade Group, Inc., Jade WR, Inc., B & C Transmissions, LLC, and

CDL Transmission, LLC, (collectively "Plaintiffs"), for their Complaint against

Defendants Cottman Transmission Systems, LLC ("Cottman"), American Driveline

Systems, Inc. ("American Driveline"), and Global Powertrain Systems, LLC ("GPS")

(collectively "Defendants"), state and allege as follows:

## INTRODUCTION

1.      Defendant Cottman has materially breached its express obligation to

Plaintiffs under their license agreements with Cottman (**Exhibits A-D** collectively, "the

Cottman License Agreements") as well as the implied covenant of good faith and fair

dealing by failing "to continue to develop, promote and protect the good will and reputation associated with the Cottman names and marks."

2.      Cottman has also materially breached its contractual duties by severely cutting back or entirely eliminating certain services that it is contractually obligated to provide and that it formerly provided to Plaintiffs and other franchisees.

3.      Specifically, Cottman has failed to do the following:  (1) provide effective assistance to franchise owners seeking to relocate their centers (see Exhibits A-D, ¶ 5(a)); (2) assist with the negotiation of a lease for relocated centers (see Exhibits A-D, ¶ 5(a)); (3) provide assistance with the layout of new centers and the installation of equipment (see Exhibits A-D, ¶ 5(b));  (4) provide meaningful assistance in finding and evaluating personnel for franchisees to employ (see Exhibits A-D,  ¶ 5(c)); (5) provide Plaintiffs an Operator's Manual that offers guidance in the methods, procedures and techniques of operating a Total Auto Care center (see Exhibits A-D, ¶ 5(d));  and (6) provide training in general auto repair to conform to Cottman's new Total Auto Care business model (see Exhibits A-D, ¶ 5(h)).

4.      In addition, Cottman's parent, Defendant American Driveline, has tortiously interfered in the Cottman License Agreements between Plaintiffs and Cottman by adopting a strategic policy to discontinue providing financial support and resources for the Cottman  franchise system, depleting Cottman of resources and forcing Cottman to breach its contractual obligations to provide support services to Plaintiffs and other Cottman franchisees.

5.      Cottman's withdrawal of contractually mandated support has caused the de facto termination of many franchises.  The Cottman franchise system has contracted

from a network of more than 400 centers located throughout the United States and Canada to only 56 isolated centers today.

6.      American Driveline's decision to discontinue support has effectively turned the Cottman System from a recognized national brand into a collection of local transmission shops operating under the Cottman name, but whose goodwill arises not from the goodwill associated with the Cottman name and marks, but rather from each local shop's individual reputation based on the individual shop's owner efforts.

7.      In addition, Defendants American Driveline and GPS have tortiously interfered in the business relationships between Cottman franchisees and their existing customers.  American Driveline, through its agents, has encouraged existing Cottman center fleet customers to switch to using GPS remanufactured transmissions rather than continue to have their transmissions rebuilt at their local Cottman center.

8.      Defendants' breaches of their contractual and common law duties have harmed Plaintiffs.  Cottman has not provided the services Plaintiffs contracted for in exchange for the payment of royalties and advertising fees, and Defendants' wrongful actions have diminished the value and profitability of Plaintiffs' Cottman centers.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of the Complaint pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00.  This Court also has jurisdiction pursuant to the Cottman License Agreements between Plaintiffs and Defendant Cottman which provide that any legal proceedings arising out of the License

Agreements shall be brought either in a court of general jurisdiction in Montgomery County, Pennsylvania or in this Court.   (Exhibits A-D, ¶ 29(a)).

10.     Venue in this District is proper under 28 U.S.C. § 1391 because a substantial number of the acts and transactions forming the basis of the Complaint took place within this District.

11.     Defendants are subject to jurisdiction in this District because either they are residents of this District, engaged in the wrongful acts alleged in this Complaint within this District, causing injury within this District; and/or because they contracted to provide, and did provide, goods or services in this District; and/or because they offered or sold, or participated in the offer or sale of franchises within this District.

### PARTIES

12.     Plaintiff The Jade Group, Inc. is a corporation organized under the laws of the State of Colorado with its principal place of business in Denver, Colorado, and is a citizen of the State of Colorado.  The Jade Group Inc.'s issued and outstanding shares are owned by Jacobus ("Jim") Dietvorst.  Pursuant to a Cottman License Agreement dated September 8, 2003, as amended (Exhibit A), The Jade Group, Inc. operates the Cottman center located at 2630 S. Broadway, Denver, CO 80210.

13.     Plaintiff Jade WR, Inc. is a corporation organized under the laws of the State of Colorado with its principal place of business in Wheat Ridge, Colorado, and is a citizen of the State of Colorado.  Jade WR Inc.'s issued and outstanding shares are owned by Jacobus ("Jim") Dietvorst.  Pursuant to a Cottman License Agreement dated November 1, 2009 (Exhibit B), Jade WR Inc. operates the Cottman center located at 4895 Ward Road, #3C, Wheat Ridge, CO  80033.  Jade WR, Inc.'s written License

Agreement expired as of January 1, 2016, however, the parties continue to operate pursuant to an oral agreement, the terms of which are embodied in the September 8, 2003 License Agreement, as amended.

14.     Plaintiff B&C Transmissions, LLC is a South Carolina limited liability company with its principal place of business in Greenville, South Carolina.  Becky Beacham is the Managing Member of B&C Transmissions, LLC.  All of its members are citizens of the State of South Carolina.  Pursuant to a Cottman License Agreement dated November 23, 1998, B&C Transmissions, LLC operates a Cottman center located at 401 N. Pleasantburg Drive, Greenville, SC 29607 (Exhibit C).  The B & C Transmissions, LLC written License Agreement expired as of January 1, 2016, however, the parties continue to operate pursuant to an oral agreement, the terms of which are embodied in the November 23, 1998 License Agreement, as amended.

15.     Plaintiff CDL Transmission, LLC is a South Carolina limited liability company with its principal place of business in Spartanburg, South Carolina.  Michael Morrison is the Managing Member of CDL Transmission, LLC.  All of its members are citizens of the State of South Carolina.  Pursuant to a Cottman License Agreement dated May 8, 2009 (Exhibit D), CDL Transmission, LLC operates a Cottman center located at 120A Southport Road, Spartanburg, SC  29306.

16.     Cottman is a Delaware limited liability company, formed in July 2000, with its principal place of business currently in Horsham, Pennsylvania, and is a citizen of either the Commonwealth of Pennsylvania or the State of Delaware.  Cottman is involved in the transmission repair business and the selling of franchised transmission repair centers, which at one time totaled more than 400 across the United States and

Canada.   Cottman, as franchisor, is a party to each Plaintiff's Cottman License Agreement.

17.     Defendant American Driveline is a Delaware corporation with its principal place of business currently in Horsham, Pennsylvania, and is a citizen of either the Commonwealth of Pennsylvania or the State of Delaware.  American Driveline is the parent corporation of Cottman, AAMCO Transmissions, Inc., and GPS.

18.     Defendant GPS is a Delaware limited liability company with its principal place of business in Newnan, Georgia, and is a citizen of either the State of Georgia or the State of Delaware.  GPS manufactures and sells remanufactured transmissions to general repair shops, car dealerships, fleets and other businesses located in the United States, including to such businesses located in the Commonwealth of Pennsylvania.

<u>**BACKGROUND FACTS**</u>

<u>**Automotive Transmission Repair**</u>

19.     Since the 1960s, Cottman (or a predecessor in interest) has been engaged in the sale of franchises to operate Cottman Transmission Centers, which are businesses that specialize in the repair of automotive transmissions.

20.     An automotive transmission is the single most complex "part" in today's automobiles.  A modern automatic transmission contains mechanical systems, hydraulic systems, electrical systems, and computer controls, all within one single component.

21.     It is, therefore, not surprising that transmissions are one of the most expensive components to repair on modern automobiles—an overhaul of a transmission, *i.e.*, repairs so extensive that it cannot be fixed by adjustment or by replacement of accessible parts, can cost several thousand dollars.

22.     A transmission overhaul can be done in one of two ways, both of which achieve the same result.   The first type of transmission overhaul is a "rebuild," which involves the complete disassembly of the transmission, the inspection of all internal parts, the replacement of the worn or damaged parts, reassembly and then reinstallation on the vehicle.   Rebuilds are performed at a shop by a highly-skilled transmission technician who must know how to rebuild transmissions for a variety of manufacturers' and vehicles' specifications (a "Transmission Rebuilder" or "Builder").

23.     The second way to overhaul a transmission is to replace the old transmission with a transmission that has already been rebuilt by somebody else, at a location different than the transmission repair shop.   In this type of repair, the replacement transmission is known as a "remanufactured" transmission.

24.     For transmission repair shops, including Cottman centers, rebuilds are the preferred choice.   While the retail price of the two types of overhauls is comparable, the profit margins for rebuilds are much higher.   This is because the cost of a rebuilt transmission is based on the only the necessary replacement parts and the labor of the Transmission Rebuilder, while the cost of a remanufactured transmission includes every component of the transmission, remanufacturer's overhead, labor costs and profit, which still must be paid.

### Plaintiffs' Cottman License Agreements

25.     Plaintiffs' Cottman License Agreements set forth a number of Cottman's continuing obligations to support Plaintiffs as Cottman "OPERATORS":

26.     Cottman is obligated under Section 5 of Plaintiffs' License Agreements (see Exhibits A-D), Services Rendered by COTTMAN, to provide the following services, among others:

       a.     assist OPERATOR in obtaining a location and negotiating a lease;

       b.     assist OPERATOR with the layout of the CENTER and the installation of equipment;

       c.     assist OPERATOR in finding and evaluating personnel;

       d.     furnish to OPERATOR the Operator's Manual described in section 6, parts catalogs, and instructional and training materials for the purpose of providing guidance in the methods, procedures and techniques of operating a CENTER;

       * * *

       h.     provide … additional training programs and meetings; and

       i.     continue to develop, promote and protect the good will and reputation associated with the Cottman names and marks and other distinguishing aspects of the SYSTEM.

Plaintiffs License Agreements, ¶ 5.

27.     Section 9 of the Cottman License Agreement, Advertising, obligates Cottman to provide advertising services to franchisees in exchange for a weekly advertising fee. [See **Exhibits A-D**, ¶ 9.]

28.     Section 19 of the License Agreement, Termination, enumerates the specific grounds upon which Cottman has the right to terminate a franchisee's License Agreements prior to the expiration of its term.  Absent the occurrence of one of the reasons set forth in Section 19, Cottman has no legal right to terminate a License Agreement.  [See **Exhibits A-D**, ¶ 19.]

29.     Section 21, Covenant Not to Compete, provides, in relevant part, that:

For a period of two (2) years after the termination of this Agreement for any reason, OPERATOR shall not:

      i.    within a radius of ten (10) miles of OPERATOR's former CENTER and three (3) miles of any other CENTER in operation at the time of termination of any CENTER that has commenced operation during said two (2) year period, begin or engage in any business the same as, similar to or in competition with such CENTER; …

[See **Exhibits A-D**, ¶ 21(b).]

## Applicable Franchise Laws and Regulations

30.    In the 1950s and 1960s, modern franchising took off as a method of doing business, but was unregulated and subject to widespread abuse.  State and federal regulators began to study the situation in the late 1960s and concluded that the sale of franchises was similar to the unregulated sale of securities in the 1920s.  The Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 41, *et seq.*, provides that "unfair or deceptive acts or practices in or affecting commerce are hereby declared unlawful" and broadly empowers the Federal Trade Commission ("FTC") to issue regulations prohibiting such activities.  15 U.S.C. § 45(a)(1).  Accordingly, in 1979, the FTC adopted the "FTC Franchise Rule," a trade regulation governing the sale of franchises that is roughly modeled on the Securities Exchange Act of 1934.  16 CFR Part 436.

31.    The FTC Franchise Rule requires a franchisor to provide a prospective franchisee with certain disclosures, contained in a written offering circular, or disclosure statement, prior to the purchase of the franchise.  This disclosure statement, also required under many state franchise laws, is referred to as a Franchise Disclosure Document ("FDD").[1]  Failure to furnish prospective franchisees with the specified

---

[1] In 2007, FTC Franchise Rule was amended.  Prior to the 2007 amendments, this document was referred to as a Uniform Franchise Offering Circular ("UFOC").

information is an unfair or deceptive practice within the meaning of the FTC Act and a violation of federal law.  16 C.F.R. §§ 436.1, 436.6.

32.     Thus, before Cottman enters into a License Agreement with a prospective franchise, it is required to present the prospective franchisee with an FDD containing the required disclosures; the prospective franchisee is entitled to rely on these disclosures as truthful.  If Cottman failed to make these legally-mandated disclosures in a truthful manner, it would be liable for an unfair or deceptive trade practice and violation of federal (and, in some instances, state) law.

33.     Cottman's April 30, 2015 FDD states:   "We offer Cottman Center franchises only to: (1) existing Cottman franchisees who are renewing an existing Cottman License Agreement; (2) purchasers of an operating Cottman Center from an existing Cottman franchisee and who meet our qualifications; and (3) purchasers of a recently closed Cottman Center who will re-open and operate that center and who meet our qualifications."  Cottman 2015 FDD, Item 1, p. 3.  [A copy of Item 1 of Cottman's 2015 FDD is attached as **Exhibit E**.]  Thus, Cottman represents in its FDD that it does not offer franchises to persons wishing to open new Cottman centers.

## American Driveline Acquires Cottman's Direct Competitor

34.     In March 2006, Cottman's parent company, Defendant American Driveline, acquired AAMCO Transmissions, Inc., Cottman's most significant competitor in the transmission repair business.

35.     American Driveline, AAMCO and Cottman's then-President and CEO Todd Leff announced at the time of the AAMCO acquisition that it was American

Driveline's intent to phase out the Cottman brand within three years and convert existing Cottman centers to AAMCO centers.

36.     Although a significant number of Cottman franchisees did, in fact, switch to the AAMCO brand after American Driveline acquired AAMCO in 2006, other Cottman franchisees refused to do so or were not permitted to switch because they were located in close proximity to an existing AAMCO center.

37.     Because of the significant push-back from Cottman franchisees refusing to convert to the AAMCO brand, Cottman retreated from its announced position that it would phase out the Cottman brand within three years.

38.     Not only were existing Cottman franchisees allowed to remain Cottman franchisees, between 2006 and 2008, existing Cottman franchisees were allowed to acquire closed Cottman centers and re-open them as Cottman locations.

39.     Indeed, when Marc Graham ("Graham") replaced Todd Leff as the CEO of American Driveline in September 2009, Cottman itself began taking over failing centers with the apparent intent to make them profitable and resell them as Cottman centers. Cottman ended up operating around ten such centers as company-owned stores. However, Cottman was unable to turn these centers around and make them profitable. Cottman President and CEO Randy Wright ("Wright") later admitted that operating failed Cottman centers was "not [Cottman's] area of expertise."  To cut its losses, Cottman ultimately sold off its company-owned centers to new Cottman franchisees at below market prices.

## Cottman Reaffirms Its Obligation to Develop the Cottman Franchise System

40.     At a Strategic Planning Committee ("SPC") [2] meeting on November 30, 2011, Cottman President and CEO Wright announced that one of Cottman's major goals for 2012 was to once again grow the number of Cottman centers, and that this goal had the full support of American Driveline and its CEO Graham.

41.     Wright stated that growth would begin with the acquisition by existing Cottman franchise owners of closed Cottman franchises, followed by the addition of new Cottman franchise locations.

42.     Wright explained that Cottman's goal was to grow the number of Cottman centers back to 100 within the first year and then develop plans through open markets to grow beyond 100 Cottman centers in subsequent years.  He also agreed to develop a list of available markets and to provide this list to existing Cottman franchisees.

43.     Cottman reaffirmed its commitment to regrow the Cottman brand on multiple additional occasions throughout 2012, as follows:

- At the January 12, 2012 SPC meeting attended by Plaintiff Jim Dietvorst, Wright reaffirmed Cottman's major goal to regrow the brand to 100 centers within one year, and to develop strategies to grow beyond 100 stores in subsequent years.

- Cottman once again reiterated the commitment to re-grow the Cottman brand in the First Quarter 2012 Transmitter newsletter distributed to all Cottman franchisees which stated that among Cottman's strategic goals was to "Grow back to 100 centers within one year; then develop plans through open markets to grow beyond 100." *Transmitter,* Q1 2012, p.2.  [A copy of the First Quarter 2012 Transmitter newsletter is attached as **Exhibit F**.]

- In his "From the Desk of the President" column in the Second Quarter 2012 Transmitter, Wright stated that Cottman's #2 Goal (after developing more sales) was "A Plan for More Cottman Centers" which included re-opening suspended centers, growing additional centers in franchisees' markets and focusing on

---

[2] The SPC is comprised of Cottman's President, Randy Wright, Cottman's marketing and internet department heads, and between four and six top-performing franchisees chosen by Randy Wright.

areas without competition.  Indeed, Mr. Wright concludes his column by stating in bold, italicized letters, "*WHAT ONCE WAS GREAT WILL BE AGAIN.*" *Transmitter,* Q2 2012, p. 1.  [[A copy of the Second Quarter 2012 Transmitter newsletter is attached as **Exhibit G**.]

- In April 2012, Franchisee Fred Bowen, who owned three Cottman centers in North Carolina, was even permitted to convert his AAMCO Center to a Cottman Center.

- Wright announced similar Cottman strategic growth goals at the May, 2012 Cottman National Convention.

- One of the agenda items for the SPC meeting on July 25, 2012 was: "How to develop additional Cottman locations with current owners?"

44.    Thus, in late 2011 and throughout 2012, Wright reaffirmed on multiple occasions that Cottman intended to honor its contractual obligation to "continue to develop, promote and protect the good will and reputation associated with the Cottman name and marks and other distinguishing aspects of the [Cottman] SYSTEM," [*see* **Exhibits A-D**, at ¶ 5(i)], and began taking steps to make that happen.

45.    Plaintiffs relied on Cottman's actions, and its verbal and written reaffirmations that with American Driveline's full support, Cottman would continue to rebuild and develop the Cottman brand and system.

46.    During 2013, although little progress was being made toward meeting Cottman's announced goal to regrow the Cottman brand, the Cottman Parties gave Franchisees no reason to believe that they had changed their position with regard to their growth strategy for Cottman.

### Based on American Driveline's New Business Plan, Cottman Renegs on its Promise to Regrow the Cottman Franchise System

47.    In September 2013, Brett Ponton was appointed to replace Marc Graham as American Driveline's President and CEO.

13

48.     In early 2014, Cottman's Internet department head proposed to embark on an Internet advertising campaign announcing to the public that Cottman was seeking additional franchisees.   Franchisees, including Plaintiffs, were excited to see that progress toward regrowth of the brand was being made.

49.     Franchisees, including Plaintiffs, became concerned, however, when, later in January 2014, they learned that American Driveline had vetoed the proposed Internet ad campaign.

50.     The franchisees serving on the SPC, including Plaintiff Jim Dietvorst, asked to meet with Mr. Ponton prior to Cottman's Annual Convention in May 2014 to raise their concerns about the lack of progress being made toward increasing the number of Cottman franchises and to understand why American Driveline had vetoed Cottman's proposed Internet ad campaign.

51.     At the SPC meeting the day before Cottman's Annual Convention in May, 2014, Brett Ponton ("Ponton"), the CEO of Cottman's parent, American Driveline, announced that it was American Driveline's plan to focus its resources on its AAMCO brand going forward, and that no resources would be invested in growing the Cottman brand.

52.     Plaintiff Jim Dietvorst was a member of the SPC at all times relevant to Plaintiffs' claims and was present when Ponton made this announcement.

53.     When SPC members, including Plaintiff Dietvorst, objected, Ponton responded that Cottman franchisees were told by Cottman and American Driveline's then-President and CEO Todd Leff in March 2006 that American Driveline's business

plan included converting Cottman franchisees to the AAMCO brand and phasing out the Cottman brand.  Ponton said that American Driveline's plan had not changed.

54.    Ponton also reported that he had recently addressed American Driveline's goals with the company's Board of Directors, and the American Driveline Board had established a business model in which AAMCO was to be the strong national brand and Cottman would be just a small, regional brand.

55.    In fact, as a result of American Driveline's acquisition of Cottman's direct competitor AAMCO Transmissions, Inc. in March 2006, and its subsequent push to convince Cottman franchisees to switch to the AAMCO brand, between 2006 and the present, the number of Cottman franchises has significantly decreased.    Prior to American Driveline's acquisition of AAMCO, there were more than 400 Cottman Centers across the United States and Canada.   Today, there are only 56 Cottman Centers in operation.

56.    However, Mr. Ponton's statement that American Driveline and Cottman's business plan has not changed since 2006 is not borne out by the facts.  As alleged in paragraphs 37 through 46 above, Cottman had rejected Todd Leff's plan to eliminate the Cottman brand and, between 2009 and May 2014, reaffirmed its contractual obligation to develop and protect the brand.

<u>**Cottman Has Breached Its Contractual Obligations<br>and the Implied Covenant of Good Faith and Fair Dealing**</u>

***Cottman Has Failed to Continue to Develop, Promote and Protect the Good Will<br>and Reputation Associated With the Cottman Name and Marks***

57.    Plaintiffs operate under a Cottman standard-form License Agreement that expressly obligates Cottman to "continue to develop, promote and protect the good will

and reputation associated with the Cottman names and marks." [*See* **Exhibits A-D,** at ¶ 5(i).]

58.     By reneging on its announced strategy to re-grow the Cottman brand, Cottman has breached its obligations under Sec. 5(i) of Plaintiffs' License Agreements.

59.     Specifically, Cottman has embarked on a strategy, at the direction of American Driveline, to suppress the growth of the Cottman system and maintain Cottman as a second-class regional brand, rather than re-grow the Cottman franchise system to the nationally recognized brand it once was.

60.     In addition, American Driveline's decision to stop allocating resources to support the Cottman franchise system has had, and continues to have, an adverse effect on the goodwill and reputation of the Cottman name and brand, placing Cottman in breach of its express and implied contractual obligations.

Cottman Has Gutted the National Intercenter Warranty Program.

61.     For example, Cottman has effectively gutted the National Intercenter Warranty Program. [*See* **Exhibits A-D,** at ¶ 13.]  When the Cottman franchise system had a national presence, Cottman had a strong national intercenter warranty program in which more than 400 Cottman centers spread across the United States and Canada participated.  Plaintiffs were able to use Cottman's national warranty as an important tool to persuade potential customers to patronize their Cottman centers over their competitors, including AAMCO. Today, with only 56 Cottman-branded centers, Cottman's national warranty is far less valuable, placing Cottman franchisees, including Plaintiffs, at a competitive disadvantage *vis-a-vis* AAMCO and other national transmission chains competing with Cottman.

16

62.    Although Plaintiffs are now required to affiliate with the Automatic Transmission Rebuilders Association ("ATRA") for warranty coverage nationwide, many potential customers prefer the strength of a national same-brand warranty over a referral to a local "mom & pop" independent shop of the type affiliated with ATRA.

63.    The dilution of Cottman's National Intercenter Warranty Program has negatively affected the good will and reputation that Cottman formerly held, and adversely impacted Plaintiffs' ability to attract customers, placing Cottman in breach of its express and implied contractual obligations.

64.    Plaintiffs are harmed by the shrinking of the Cottman system and concomitant dilution of Cottman's national warranty program because Cottman's systemic failure to honor its contractual duties in this regard adversely affects Plaintiffs' ability to successfully market their services and carry out their daily business operations, diminishes the value of each Plaintiff's franchise on resale, and results in Plaintiffs paying royalties for services Cottman refuses to provide.

<u>Cottman, at the Direction of American Driveline, Has Promoted GPS Remanufactured Transmissions to the Detriment of Its Franchisees.</u>

65.    Another way in which Cottman has failed to protect the goodwill and reputation of its brand is by assisting American Driveline to encourage existing and potential Cottman customers to use GPS remanufactured transmissions rather than have their transmissions rebuilt at a Cottman center.

66.    In or around 2012, American Driveline formed GPS, an Atlanta-based state-of-the-art transmission remanufacturing facility. Although Cottman franchisees are not required to purchase remanufactured transmissions from GPS, Cottman strongly encourages franchisees to do so. This is problematic because, as stated in paragraphs

20-22 above, even taking into account the favorable pricing offered to Cottman franchisees by GPS, the cost to purchase and install remanufactured transmissions is significantly higher than the cost to rebuild transmissions, decreasing the franchisee's profitability.

67.    To make matters worse, GPS is directly competing with Cottman franchisees for fleet and insurance company customers.

68.    Wright has actively engaged in discussions with existing and potential Cottman center fleet customers such as Drive Time and CarMax to encourage these customers to use GPS remanufactured transmissions.

69.    In addition, Cottman Operations Managers have begun to contact fleet customers in their franchisees' regions on behalf of GPS, driving existing and potential Cottman customers to GPS and away from Cottman.

70.    GPS also blatantly favors AAMCO over Cottman, displaying the AAMCO logo on its website and referring customers to AAMCO rather than Cottman for installation of GPS remanufactured transmissions.   Only after Cottman franchisees complained to American Driveline, did GPS remove the AAMCO logo from its website. However, GPS continues to refer customers to AAMCO as its preferred installer.

71.    As GPS grows and former Cottman fleet customers and national accounts purchase GPS remanufactured transmissions rather than rebuilt Cottman transmissions, Cottman Centers will become installers of remanufactured GPS transmissions rather than transmission rebuilders and profitability will significantly decline.

72.    The pressure placed upon Cottman franchisees to purchase GPS remanufactured transmissions rather than rebuild transmissions at their shops results in increased costs for Cottman franchisees. Cottman's active participation in pirating existing and potential Cottman center customers on behalf of GPS and failing to strongly object to GPS's preferential treatment of the AAMCO brand constitute breaches of Cottman's duty to protect the good will and reputation of the Cottman System and brand.

73.    Plaintiffs are harmed by Cottman promoting the use of GPS remanufactured transmissions instead of directing customers to Cottman centers to have their transmissions rebuilt because Cottman's systemic failure to honor its contractual duties in this regard adversely affects Plaintiffs' ability to carry out their daily business operations and diminishes the value of each Plaintiff's franchise on resale, and undermines Plaintiffs ability to operate their centers to maximize profitability.

<u>Cottman's National Accounts Program Has All But Disappeared.</u>

74.    Cottman has also failed to develop, promote and protect the good will and reputation of the Cottman brand by allowing Cottman's national accounts to be pirated by AAMCO and by reducing the level of service provided to Cottman franchisees under Cottman's national accounts program, all at the direction of American Driveline.

75.    Prior to 2006, Cottman maintained relationships with between 250 to 300 national accounts under which national account customers received previously negotiated rates for transmission repairs at all Cottman centers. National account referrals comprised a significant portion of Cottman centers' customer base and were a significant source of revenue for franchisees.

76.     However, after the 2006 "merger" with AAMCO, Cottman encouraged its national account customers to deal with AAMCO rather than Cottman and the number of Cottman national accounts shrank dramatically.

77.     In late November 2011, Cottman promised to reinvigorate Cottman's national account system as part of re-growing the Cottman system and making what once was great, great again.

78.     In the past, Cottman provided franchisees a significant amount of information about each national account including, but not limited to, the customer's name, contact person, the negotiated price, warranty information, and labor rates. Today, the number of Cottman national accounts is minimal and the only information provided is the customer's name.  Each Cottman Center must negotiate its price for transmission repair services directly with each national account customer.  Because fixed prices are no longer negotiated in advance by Cottman corporate, there is no added advantage to drive the national account customer into a Cottman Center rather than have its fleet transmission repairs performed at another local transmission shop. Yet, Cottman still takes 1% of the franchisee's gross revenue resulting from the national account sale as an administrative fee.

79.     Because Cottman no longer has a meaningful national accounts program and no longer negotiates fixed prices with fleet and other customers that have historically served as a source of repeat business, Cottman has breached its obligation to develop, promote, and protect the good will and reputation of the Cottman brand by diminishing the value of its national accounts program to both the customer and to Cottman franchisees.

80.     Plaintiffs are harmed by Cottman's failure to rebuild or maintain a meaningful national accounts program because Cottman's systemic failure to honor its contractual duties in this regard adversely affects Plaintiffs' ability to carry out their daily business operations, diminishes the value of each Plaintiff's franchise on resale, and results in Plaintiffs paying royalties for services Cottman refuses to provide.

Cottman Has Failed to Assist Franchisees to Obtain and Negotiate Leases for Their Relocated Centers.

81.     Cottman no longer provides assistance to help franchisees to locate a suitable replacement location or to negotiate a new lease.   Cottman historically maintained a real estate department led by a director of real estate.  When a new or existing franchisee was seeking an optimal site for his or her Cottman center, a member of the real estate department would conduct a detailed demographic analysis of the franchisee's territory to determine the best potential sites to locate the new Cottman center.  The team member would then visit the area and view potential sites first hand. After finding a suitable location, a member of the real estate department would assist the franchisee to negotiate the terms of the lease.  Both the real estate department and the legal department would review the proposed lease and make recommendations regarding changes to the lease terms, if necessary.

82.     Today, Cottman no longer has a real estate department and franchisees are on their own when it comes to finding a new location for their center and negotiating their new lease.  Thus, Cottman has breached its obligations under Paragraph 5(a) of its License Agreements by failing to assist franchisees to locate suitable relocation sites and negotiate their leases for those centers.

83.     Plaintiffs are harmed by Cottman's failure to meet its contractual duty to assist franchisees to obtain a location and negotiate a lease because Cottman's systemic failure to honor its contractual duties in this regard diminishes the value of each Plaintiff's franchise on resale and results in Plaintiffs paying royalties for services Cottman refuses to provide.

Cottman No Longer Provides Assistance with the Layout of New Centers and the Installation of Equipment.

84.     In the past, Cottman maintained an equipment department that would provide franchisees with a schematic drawing, based on the floor plan of the franchisee's center, identifying the most efficient layout for equipment inside the shop to ensure the shop would have a smooth production center.  This contractually-mandated service is no longer provided today, placing Cottman in breach of its duties under Paragraph 5(b) of its License Agreements.

85.     Plaintiffs are harmed by Cottman's failure to meet its contractual duty to assist franchisees with the layout of their centers and the installation of equipment because Cottman's systemic failure to honor its contractual duties in this regard diminishes the value of each Plaintiff's franchise on resale and results in Plaintiffs paying royalties for services Cottman refuses to provide.

Cottman No Longer Provides Meaningful Assistance in Finding Transmission Rebuilders, Technicians, and Managers, and No Longer Provides Any Assistance in Evaluating Proposed Personnel.

86.     Cottman historically maintained a dedicated recruitment team to assist franchisees with hiring transmission rebuilders, technicians, and center managers.  This team would write ads for franchisees to place in their local papers and place "help wanted" ads in national trade magazines.  When builder candidates were identified,

Cottman would administer a test to determine if the candidate was qualified. A team member would look over the candidate's answers and report to the franchisee on the skill set of the candidate. Cottman would also conduct a preliminary interview of the candidate, if the franchisee requested. Cottman's recruitment team would then make a recommendation to the franchisee regarding whether the candidate was suitable for the open position. In addition to the recruitment team at Cottman's national headquarters, Cottman operations managers would interview potential center managers and make a recommendation to the franchise owner on whether to hire the manager candidate.

87.    Today, there is only one person at Cottman headquarters whose function, among others, is to assist franchisees with hiring. The only function this individual performs is placing want ads for open positions at franchise locations on CareerBuilder.com. The responsive resumes, typically six or seven, are then sent to the franchisee without comment. This is the only hiring assistance Cottman provides. The candidates are not vetted in any way.

88.    Because Cottman provides no meaningful assistance in finding personnel and no assistance at all in evaluating potential candidates, Cottman is in material breach of its obligation under Paragraph 5(c) to assist franchisees in finding and evaluating personnel.

89.    Plaintiffs are harmed by Cottman's failure to meet its contractual duty to assist franchisees in finding and evaluating personnel because Cottman's systemic failure to honor its contractual duties in this regard diminishes the value of each Plaintiff's franchise on resale and results Plaintiffs paying royalties for services Cottman refuses to provide.

<u>Cottman's Operator's Manual Does Not Provide Guidance in the Methods,
Procedures, and Techniques of Operating a Total Auto Care Center.</u>

90.     While Cottman has traditionally provided only transmission repair services,
Cottman now requires franchisees to participate in Cottman's Total Auto Care program
under which Cottman centers are required to provide general auto repair services in
addition to transmission repairs.   However, Cottman's current Operator's Manual
provides no guidance on how to operate a general auto repair business and continues
to focus solely on the operation of a transmission repair business.   Franchisees must
learn by trial and error the best methods, procedures, and techniques to operate their
Total Auto Care centers.

91.     Thus, Cottman is in breach of its duty under Paragraph 5(d) to furnish
Franchisees with an Operator's Manual that instructs them in the methods, procedures
and techniques of operating a Cottman center.

92.     Plaintiffs are harmed by Cottman's failure to meet its contractual duty to
furnish Plaintiffs with an Operator's Manual that provides adequate guidance in the
methods, procedures and techniques of operating a Cottman center because Cottman's
systemic failure to honor its contractual duties in this regard results in Plaintiffs being
inadequately prepared to offer customers total auto care services, diminishes the value
of each Plaintiffs' Cottman franchise on resale, and results in Plaintiffs paying royalties
for services Cottman refuses to provide.

<u>Cottman Has Failed to Provide Necessary Training in General Auto Repairs.</u>

93.     As stated in paragraph 90 above, in recent years, Cottman has changed
its business model from exclusively providing transmission repairs to requiring
franchisees to provide general auto repairs under Cottman's Total Auto Care program.

While Cottman changed the business model under which it requires franchisees to operate, like its failure to update its Operator's Manual, Cottman has not changed the training it provides to franchisees.   Cottman's initial and continuing training deals exclusively with the business of providing transmission repairs.   Cottman provides no training to prepare franchisees to market and perform general auto repairs. For this reason, Cottman is in breach of its obligation under Paragraph 5(h) to provide training programs to assist its franchisees to operate under the Cottman System and business model.

94.    Plaintiffs are harmed by Cottman's failure to meet its contractual duty to train franchisees in the methods, procedures and techniques of providing total auto care because Cottman's systemic failure to honor its contractual duties in this regard results in Plaintiffs being inadequately prepared to offer customers total auto care services, diminishes the value of each Plaintiff's franchise on resale, and results in Plaintiffs paying royalties for services Cottman refuses to provide.

Cottman Has Severely Scaled Back Its Advertising Services.

95.    Cottman contracts with its affiliate, Ross Advertising, to provide marketing and advertising assistance for Cottman franchisees.   In the past, a designated Ross Advertising representative was assigned to assist each franchisee to design and place advertising.   Typically, all franchisees in a particular region were assigned the same Ross Advertising representative who became familiar with the local and regional advertising markets and vendors.   The representative's knowledge of the franchisee's local market enabled the Ross Advertising representative to make informed recommendations regarding where to advertise and which media outlets would provide

the best results in driving customers to franchisees' Cottman centers.   The Ross Advertising representative would also prepare ad copy for the franchisee, place Yellow Pages ads, and review and approve any local ads prepared by the franchisee.

96.    In addition, Cottman promoted its name nationally by placing ads in trade magazines, and hiring "personality" sponsors like Terry Bradshaw to promote the Cottman brand.  Cottman also regularly sponsored a NASCAR automobile.

97.    Today, there is only one Ross Advertising representative available to assist all 56 Cottman franchisees with media advertising and one additional person who, in addition to other duties, places Internet advertising.   Ross Advertising also provides some level of advertising assistance to AAMCO franchisees.  Given that only one Ross Advertising representative remains, the time this representative spends assisting AAMCO franchisees necessarily reduces the amount of time this representative is available to provide contractually mandated advertising services to Cottman franchisees.

98.    Because Ross Advertising no longer maintains a staff of dedicated regional representatives, the one remaining representative is not familiar with the best local media outlets to recommend and franchisees have no assistance with determining the most cost effective media outlets in which to place advertising.   Other than maintaining a website, no national brand advertising is provided.

99.    Cottman no longer sponsors NASCAR or hires a nationally recognized personality to promote the Cottman brand.

100.    Nonetheless, despite the significant decrease in the level of advertising services they receive, franchisees are still required to pay Cottman a weekly advertising

fee of approximately $765, the same fee they paid when Cottman provided a much higher level of service.

101.   While Paragraph 9(c) of the License Agreements gives Cottman discretion with regard to the content and placement of advertising, Cottman does not have the discretion to discontinue providing Franchisees a level of marketing and advertising support consistent with the fees that Franchisees pay Cottman for that support.

102.   By scaling back advertising services to the bare bones, providing no meaningful national brand advertising, and leaving Franchisees with the responsibility for essentially placing their own local advertising with little or no support from Cottman, Cottman has breached its duty to provide advertising support for franchisees.

103.   Plaintiffs are harmed by Cottman's failure to meet its contractual duty to provide adequate advertising services in exchange for the $765 per week in advertising fees that Plaintiffs, and all franchisees, pay because Cottman's systemic failure to honor its contractual duties in this regard diminishes the value of each Plaintiff's Cottman franchise on resale, and results in Plaintiffs paying advertising fees for services Cottman refuses to provide.

### American Driveline Has Tortiously Interfered in the License Agreements Between Plaintiffs and Cottman

104.   By making the strategic decision that no resources would be invested in growing the Cottman brand, and focusing its resources on its AAMCO and GPS brands going forward, American Driveline has tortiously interfered in Plaintiffs Cottman License Agreements.   American Driveline used its influence as Cottman's parent corporation to cause Cottman to breach its contractual obligations to its franchisees, including Plaintiffs, as set forth in Paragraphs 57 through 103 above.   American Driveline knew of

the License Agreements between Cottman and its franchisees, yet intentionally undermined the Cottman brand and materially changed the terms of the bargain contemplated by the License Agreements between Plaintiffs and Cottman in order to benefit itself and its other subsidiaries.

105.   American Driveline's conduct was willful, malicious, and oppressive.

106.   Plaintiffs are harmed by American Driveline's tortious interference in each of their Cottman License Agreements because American Driveline's decision to discontinue the historical support it provided to the Cottman franchise system adversely affects Cottman's ability to provide contractually mandated services to its franchisees, Plaintiffs' ability to carry out their daily business operations and maximize profitability, and the value of each Plaintiff's franchise on resale.

## American Driveline and GPS Have Tortiously Interfered in the Business Relationships Between Plaintiffs and Their Customers

107.   At the direction of American Driveline, acting in collusion with GPS, Wright and Cottman's operations managers' have actively solicited existing and prospective fleet customers of Cottman Franchisees, to convince these customers to buy remanufactured transmissions from GPS rather than have their transmissions repaired at Plaintiffs' Cottman centers.  This conduct gives rise to a claim of tortious interference with prospective business advantage against American Driveline and GPS, as well as a claim of conspiracy to tortiously interfere in Franchisees' prospective business relationships against American Driveline and GPS.

108.   Plaintiffs are harmed by American Driveline and GPS's tortious interference in their relationships with their current and prospective fleet customers

because this interference adversely affects Plaintiffs' ability to successfully carry out their daily business operations and maximize profitability, and diminishes the value of each Plaintiff's franchise on resale.

## COUNT I
### Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing Against Defendant Cottman

109.   Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

110.   Under Pennsylvania law, three elements are necessary to properly plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages.[3]

111.   Additionally, every contract imposes on each party a duty of good faith and fair dealing in its performance and enforcement, such that, where a party is granted discretion under the terms of a contract, the party must exercise its discretion reasonably, subject to the implied covenant of good faith and fair dealing.

112.   Finally, Pennsylvania also recognizes the doctrine of necessary implication under which every contract also includes an implied obligation to do an act necessary to carry express obligations of the contract.

113.   Importantly here, in Pennsylvania, a duty of good faith is imposed upon franchisors in their dealings with franchisees.

114.   Here, the following sections of the Cottman License Agreement set forth a number of Cottman's continuing obligations to support its franchisees:

---

[3] Pennsylvania law is the law chosen by the parties to control "any matter whatsoever which arises out of or is connected in any way with the Agreement or the franchise...."  Cottman License Agreement, ¶ 29.

**Section 5.   Services Rendered by COTTMAN.**   Cottman is obligated under Section 5 of its standard-form License Agreement, Services Rendered by Cottman, to provide the following services, among others, to its franchisees:

a.      assist OPERATOR in obtaining a location and negotiating a lease;

b.      assist OPERATOR with the layout of the CENTER and the installation of equipment;

c.      assist OPERATOR in finding and evaluating personnel;

d.      furnish to OPERATOR the Operator's Manual described in section 6, parts catalogs, and instructional and training materials for the purpose of providing guidance in the methods, procedures and techniques of operating a CENTER;

* * *

h.      provide … additional training programs and meetings; and

i.      continue to develop, promote and protect the good will and reputation associated with the Cottman names and marks and other distinguishing aspects of the SYSTEM.

**Section 9. Advertising.**   Section 9 of the Cottman License Agreement obligates Cottman to provide advertising services to franchisees in exchange for a weekly advertising fee.

**Section 19.   Termination.**   Section 19 of the License Agreement enumerates the specific grounds upon which Cottman has the right to terminate a franchisee's License Agreements prior to the expiration of its term.   Absent the occurrence of one of the reasons set forth in Section 19, Cottman has no legal right to terminate a License Agreement.

115.   As more fully set forth above, Cottman has materially breached its obligations to Franchisees under its License Agreements and/or the implied covenant of good faith and fair dealing, by:

- failing to continue to develop, promote and protect the good will and reputation associated with the Cottman names and marks;

- embarking on a strategy to maintain Cottman as a second-class regional brand while touting AAMCO as American Driveline's favored national brand, all at the direction of American Driveline;

- severely cutting back or entirely eliminating certain services that Cottman is obligated to provide to Franchisees, including the following services:

  o provide effective assistance to franchise owners seeking to relocate their centers;

  o assist with the negotiation of a lease for relocated centers;

  o provide assistance with the layout of new centers and the installation of equipment;

  o provide meaningful assistance in finding personnel for franchisees to employ, including transmission rebuilders, R&R technicians, and managers, and no longer providing any assistance in evaluating proposed personnel;

  o provide Franchisees an Operator's Manual that offers guidance in the methods, procedures and techniques of operating a Total Auto Care center;  and

  o provide training in general auto repair to conform to Cottman's new Total Auto Care business model;

- Effectively gutting the National Intercenter Warranty Program;

- Favoring GPS Over Cottman and contributing to the dilution of the Cottman brand, by:

  o pressuring Franchisees, including Plaintiffs, to purchase remanufactured transmissions from GPS at prices significantly higher than the cost to rebuild transmissions;

  o actively assisting American Driveline and GPS to solicit Cottman fleet customers in Plaintiffs' regions on behalf of GPS, driving existing and potential Cottman customers to GPS and away from Cottman centers;  and

  o failing to strongly object to GPS's preferential treatment of the AAMCO brand;

- Allowing Cottman's National Accounts Program to disappear;

- Severely scaling back its advertising services while continuing to charge the same advertising fee; and

- Acquiescing in allowing Cottman to become American Driveline's small regional brand and, to that end, eliminating services provided to Cottman franchisees, including Plaintiffs, effectively phasing out the Cottman franchise system as a national brand in derogation of and prior to the expiration of Plaintiffs' License Agreements.

116.   Cottman's affirmative decision to discontinue supporting the Cottman brand has had an adverse impact on Plaintiffs' net income and the value of their businesses.

117.   An action by a franchisor that results in a substantial decline in the franchisee's net revenue has been deemed a *de facto* or constructive termination of the franchise without good cause, even where the franchise remains in business and the franchise agreement may permit the offending conduct.

118.   Thus, Cottman has breached its contractual obligations by failing to fulfill its obligations, constructively terminating Plaintiffs' License Agreements without good cause in breach of Section 19 of the License Agreements and the implied covenant of good faith and fair dealing.

119.   Cottman's breaches of its contractual duties have harmed Franchisees by diminishing the value and profitability of their Cottman centers.

120.   Franchisees are entitled to recover their actual damages flowing from Cottman's breaches of the Agreement, which Plaintiffs estimate to far exceed $75,000, the actual amount to be determined at trial.

## COUNT II
### Tortious Interference in Plaintiffs' Cottman Franchise Agreements
### Against Defendant American Driveline[4]

121.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

122.    Under Pennsylvania law, to prevail on a claim of tortious or malicious interference with an existing contract, the plaintiff must demonstrate the following: (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.

123.    Plaintiffs were party to advantageous License Agreements with Cottman.

124.    American Driveline was aware of the existence of such License Agreements.

125.    As more fully described above, American Driveline tortiously interfered in Plaintiffs' Cottman License Agreements by adopting a strategy to discontinue all support for the Cottman franchise system, effectively preventing Cottman from carrying out its contractual duties.

126.    American Driveline has engaged in such interference knowingly, with the intent and effect that it interfere with and diminish Plaintiffs' rights under the License Agreements.

---

[4] American Driveline, as Cottman's parent, is sufficiently distinct from Cottman to permit Franchisees to prevail on a tortious or malicious interference with an existing contract claim.   *See Shared Communications Servs. Of 1800-80 JFK Blvd., Inc. v. Bell Atlantic Properties Inc.*, 692 A.2d 570, 573 (Pa. Super. Ct. 1997) (rejecting a *per se* rule that a parent corporation can never interfere in a contractual relationship between a subsidiary and another person).

127.    There exists no privilege or justification that would permit American Driveline's tortious interference.

128.    Franchisees suffered damages as a result of American Driveline's tortious interference.

129.    Franchisees are entitled to recover their damages stemming from American Driveline's tortious interference.

130.    The Court should also order American Driveline to reimburse Franchisees in a sum equal to the compensation Franchisees would have generated under the License Agreements but for American Driveline's tortious interference.

131.    Plaintiffs were harmed in an amount that substantially exceeds $75,000, the exact amount of Plaintiffs' damages to be proved at trial.

**COUNT III**
**Tortious Interference in Plaintiffs' Existing and**
**Prospective Business Relationships**
**Against Defendants American Driveline and GPS**

132.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

133.    Under Pennsylvania law, to prevail on a claim for tortious interference with prospective business relationships, the plaintiff must establish the following:   (1) a prospective contractual relation; (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of privilege of justification on the part of the defendant; and (4) actual damage resulting from the defendant's conduct.

134.    Plaintiffs had advantageous business relationships with their existing and prospective customers with the prospect of obtaining ongoing additional business from these customers.

135.   American Driveline and GPS were aware of the existence of the advantageous prospective business relationships Plaintiffs had with their existing and prospective customers, and in particular, with Plaintiffs fleet customers.

136.   As more fully described above, at American Driveline's direction, Wright and Cottman's operations managers actively solicited, on behalf of GPS, Plaintiffs' existing and prospective fleet customers to convince these customers to buy remanufactured transmissions from GPS rather than have their transmissions repaired at a Plaintiffs' Cottman centers.

137.   American Driveline and GPS engaged in such interference knowingly, with the intent and effect that it interfere with and diminish Plaintiffs' sales to their existing and prospective fleet customers.

138.   There exists no privilege or justification that would justify American Driveline and GPS's tortious interference.

139.   Plaintiffs suffered damages as a result of American Driveline's tortious interference.

140.   Plaintiffs were harmed in an amount that substantially exceeds $75,000, the exact amount of Plaintiffs' damages to be proved at trial.

### COUNT IV
### Declaratory Relief
### Termination of License Agreements
### Against Defendant Cottman

141.   Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

142.   Under Pennsylvania law, when one party to a contract engages in conduct that constitutes a breach of the fundamental essence and purpose of their contractual

relationship and frustrates the purpose of the agreement, the other party is excused from further performance and may rescind the agreement, declaring the contract void.

143.   Cottman's prior material breaches of Plaintiffs' Cottman License Agreements, as described in detail in paragraphs 57 through 103 above, constitute fundamental breaches of the essence and purpose of Plaintiffs' License Agreements and frustrate the purposes of these agreements.

144.   There is an actual, justiciable controversy between the Parties, within the scope and meaning of the United States Declaratory Judgments Act, 28 U.S.C. § 2201, as to whether Cottman's prior material breaches of Plaintiffs' License Agreements excuse Plaintiffs from further performance and permit them to rescind their License Agreements and terminate their franchise relationship with Cottman.

145.   Pursuant to the United States Declaratory Judgments Act, Plaintiffs are entitled to a declaration by this Court that, due to Cottman's prior material breaches of the fundamental and essential purposes of the Parties' contractual relationship, Plaintiffs are excused from further performance and the License Agreements are voidable by Plaintiffs.

**COUNT V**
**Declaratory Relief**
**Unenforceability of Post-Termination Covenant Not to Compete**

146.   Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

147.   Under Pennsylvania law, equitable enforcement of a covenant not to compete in a franchise agreement will only be permitted where restrictions are reasonably necessary for protection of the franchisor without imposing undue hardship

on the franchisee and the restrictions are reasonably limited as to duration of time and geographical extent.

148.   No Plaintiffs' business is within three miles of any other Cottman franchise location.

149.   Cottman is no longer in the business of selling new franchises or expanding the Cottman franchise system.  As stated in Item 1 of Cottman's 2015 FDD, Cottman no longer offers prospects the opportunity to acquire and open new Cottman centers and only offers prospective franchisees the opportunity to take over an existing center's operation.

150.   Because none of Plaintiffs' Cottman centers are located within three miles of another Cottman center, and Cottman no longer sells new franchises, enforcing the covenant not to compete in Plaintiffs' License Agreements is not reasonably necessary to protect Cottman's business interests.

151.   On the other hand, requiring Plaintiffs to relocate their businesses after their License Agreements with Cottman are terminated will impose significant undue hardship on Plaintiffs, as enforcement would require Plaintiffs to prematurely terminate their existing leases, find alternate locations, lose the investments they have made to furnish and equip their existing centers, incur the expense of moving, and furnish and equip a new location.

152.   There is an actual, justiciable controversy between the Parties, within the scope and meaning of the United States Declaratory Judgments Act, 28 U.S.C. § 2201, as to whether Cottman has a protectable interest in preventing Plaintiffs from operating independent transmission and/or automotive repair businesses at their current locations

post-termination and, thus, whether the covenant not to compete in Plaintiffs' License Agreements is enforceable.

153.    Pursuant to the United States Declaratory Judgments Act, Plaintiffs are entitled to a declaration by this Court that the covenant not to compete in Plaintiffs' Cottman License Agreements is not reasonably necessary to protect Cottman's business interests and that enforcing the covenant would impose undue hardship on Plaintiffs.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request the following relief:

(a)    A judgment awarding Plaintiffs compensatory and consequential damages, including, without limitation, their losses flowing from Cottman's breaches of its obligations under Plaintiffs' License Agreements, pre-judgment and post-judgment interest;

(b)    A judgment awarding Plaintiffs compensatory and consequential damages, including, without limitation, their losses flowing from American Driveline's tortious interference with Plaintiffs' Cottman License Agreements, pre-judgment and post-judgment interest;

(c)    A judgment awarding Plaintiffs compensatory and consequential damages, including, without limitation, their losses flowing from American Driveline and GPS's tortious interference in Plaintiffs' existing and prospective business expectancies, pre-judgment and post-judgment interest;

(d)    A judgment awarding Plaintiffs attorneys' fees and costs;

(d)     A judgment declaring that Cottman's prior material breaches excuse

Plaintiffs' obligation to further perform under the License Agreements and permitting

Plaintiffs to rescind their License Agreements and terminate their franchise relationships

with Cottman;

(e)     A judgment declaring that the covenant not to compete in Cottman's

License Agreements is unenforceable a to Plaintiffs; and

(f)     Such other and further relief as the Court deems just and fair.


Dated this ___ day of March, 2016          **REGER RIZZO DARNALL, LLP**

                                           By: _____
                                               Harris J. Chernow
                                               Steven Kapustin
                                           Cira Centre, 13th Floor
                                           2929 Arch Street
                                           Philadelphia, PA  19104
                                           Phone:  (215) 495-6500
                                           Fax:  (215) 495-6600
                                           hchernow@regerlaw.com
                                           skapustin@regerlaw.com

Of counsel:

**DADY & GARDNER, P.A.**
J. Michael Dady
Barbara A. Bagdon
5100 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
612-359-9000
jmdady@dadygardner.com
bbagdon@dadygardner.com