**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THE JADE GROUP, INC., et al., | |
| *Plaintiffs*, | CIVIL ACTION |
| v. | NO. 16-01237 |
| COTTMAN TRANSMISSION CENTERS, LLC, et al., | |
| *Defendants*. | |

PAPPERT, J.                                                              JULY 13, 2016

<u>**MEMORANDUM**</u>

The Jade Group, Inc., Jade WR, Inc., B&C Transmissions, LLC, and CDL Transmission, LLC (collectively "Plaintiffs") are franchisees of Cottman Transmission Centers, LLC ("Cottman"), an automotive transmission repair franchise.  They sued Cottman, its parent American Driveline Systems, Inc. ("American Driveline") and another American Driveline subsidiary, Global Powertrain Systems, LLC (collectively "Defendants") alleging breach of contract and tortious interference with contract and with Plaintiffs' business relationships. Plaintiffs allege that Cottman breached the terms of license agreements each entered into with Cottman (the "License Agreements") by, among other things, failing to maintain the goodwill and reputation of the franchise.

Before the Court is Defendants' motion to dismiss the complaint for failure to state a claim.  They contend that the statute of limitations bars Plaintiffs' lawsuit and that, in any event, Plaintiffs have failed to state a claim because they have not alleged a breach of any contractual obligations in the License Agreements.  They argue that all claims for tortious interference and

declaratory relief must similarly fail because there is no underlying breach of contract.  For the

reasons that follow, the motion is granted in part and denied in part.

## I.

Plaintiffs are four individual Cottman franchisees that entered into the License

Agreements with Cottman at various points: B&C Transmissions, LLC ("B&C") on November

23, 1998; The Jade Group, Inc. ("Jade") on September 8, 2003; CDL Transmission, LLC

("CDL") on May 8, 2009; and Jade WR, Inc. ("Jade WR") on November 1, 2009.  (Compl.

¶¶ 12–15, Exs. A–D.)

The License Agreements provide, in relevant part:

> a. **Section 5.  Services Rendered by Cottman.**  Cottman is obligated to:
>
>> a. assist OPERATOR in obtaining a location and negotiating a lease;
>> b. assist OPERATOR with the layout of the CENTER and the installation of equipment;
>> c. assist OPERATOR in finding and evaluating personnel;
>> d. furnish to OPERATOR the Operator's Manual . . . for the purpose of providing guidance in the methods, procedures and techniques of operating a CENTER;
>> . . .
>> h. provide initial training and additional training programs and meetings; and
>> i. continue to develop, promote and protect the good will and reputation associated with the Cottman names and marks and other distinguishing aspects of the SYSTEM.[1]

(*See, e.g.*, *id.*, Ex. A at 5–6.)  Section 9 of the License Agreements state that Cottman must

provide advertising services to franchisees in exchange for a weekly advertising fee.  (*Id.*

(*Id.* ¶ 26, Ex. A at 8–9.)  The License Agreements also contain a non-compete clause, which

states that for two years after termination of the agreement a franchisee shall not operate a

---

[1]    In the License Agreements' recitals, "SYSTEM" is defined as the "system" that Cottman developed "for conducting operations in the automotive transmission business which consists, in part, of the use of the Cottman name, Cottman's methods, procedures, techniques, and a network of Centers devoted exclusively to the repair of automotive transmissions (hereinafter called "CENTERS") which use the Cottman name and said methods, procedures and techniques."  (*See, e.g.*, Compl., Ex. A at 3.)

similar business "within a radius of ten [ ] miles of [its] former CENTER and three [ ] miles of any other CENTER in operation at the time of termination of any CENTER that has commenced operation during said two [ ] year period."  (*Id.* ¶ 29, Ex. A at 15–16.)

### A.

In March 2006, American Driveline acquired Cottman's "most significant competitor in the transmission repair business," AAMCO Transmissions, Inc. ("AAMCO").  (*Id.* ¶ 34.)  At the time of the acquisition, American Driveline, AAMCO and Cottman's then-President and Chief Executive Officer ("CEO") Todd Leff stated that American Driveline intended to "phase out the Cottman brand within three years and convert existing Cottman centers to AAMCO centers." (*Id.* ¶ 35.)  Although a "significant number" of Cottman franchisees switched to AAMCO centers, some "refused to do so or were not permitted to switch because they were located in close proximity to an existing AAMCO center."  (*Id.* ¶ 36.)

Based on the "significant push-back" from many Cottman franchisees that refused to switch, "Cottman retreated from its announced position that it would phase out the Cottman brand."  (*Id.* ¶ 37.)  It not only permitted existing franchisees to continue to operate as Cottman centers, but also allowed them to acquire closed Cottman centers and re-open them under the Cottman name.  (*Id.* ¶ 38.)  Despite Cottman's statements that it did not intend to phase out the company, the number of Cottman franchises declined from over 400 in 2006 to approximately 74 by the end of 2011.  (*Id.* ¶ 5; Defs.' Mot. to Dismiss ("Defs.' Mot."), Ex. 1, ECF No. 15.)

### B.

At a Strategic Planning Committee ("SPC") meeting on November 30, 2011, Cottman President and CEO Randy Wright stated that one of the company's goals for 2012 was to grow the number of Cottman centers.  (Compl. ¶ 40.)  He announced that he had the support of

3

American Driveline's CEO Marc Graham and that Cottman would begin the process by having existing Cottman franchisees acquire closed centers.  (*Id.*)  Cottman would then add new franchise locations, with the goal to grow the number of centers to 100 in 2012 and subsequently expand into new markets.  (*Id.* ¶¶ 41–42.)  He told existing Cottman franchisees that he would provide a list of potential new markets in order to aid the expansion.  (*Id.*)

Cottman "reaffirmed its commitment to regrow the Cottman brand" throughout 2012. (*Id.* ¶ 43.)  During a January 12, 2012 SPC meeting, Wright affirmed Cottman's goal to add 100 centers within one year and continue the expansion in subsequent years.  (*Id.*)  That message was reiterated during company conferences and newsletters, including Cottman's first and second quarter "Transmitter" newsletters, (*Id.*, Exs. F, G), during a May 2012 Cottman National Convention and during a July 25, 2012 SPC meeting.  (*Id.* ¶ 43.)  Despite the company's statements about growing the number of Cottman centers, the number of stores decreased to 65 by the end of 2012.  (Defs.' Mot., Ex. 1.)

In 2013, Cottman had made little progress toward meeting its goal of "regrow[ing]" the Cottman brand.  (Compl. ¶ 46.)  Despite Wright's plan to increase the number of Cottman centers to over 100, there were just 67 centers at the end of 2013.  (Defs.' Mot., Ex. 1.)  The company, however, did not give the franchisees any "reason to believe that they had changed their position with regard to their growth strategy for Cottman."  (*Id.*)

## C.

In September 2013, Brett Ponton replaced Graham as American Driveline's President and CEO.  (*Id.* ¶ 47.)  In January 2014, American Driveline vetoed a proposed internet advertising campaign which would have announced that Cottman was seeking new franchisees.  (*Id.* ¶¶ 48–49.)  After learning about the veto, certain franchisees asked to meet with Ponton "to raise their

4

concerns about the lack of progress being made toward increasing the number of Cottman franchises and to understand why American Driveline had vetoed Cottman's proposed [i]nternet ad campaign."  (*Id.* ¶ 50.)

At an SPC meeting the day before Cottman's Annual Convention in May 2014, Ponton announced that American Driveline intended to "focus its resources on its AAMCO brand going forward, and that no resources would be invested in growing the Cottman brand."  (*Id.* ¶ 51.) Ponton also stated that he discussed American Driveline's goals with the company's Board of Directors (the "Board"), and that the Board "had established a business model in which AAMCO was to be the strong national brand and Cottman would be just a small, regional brand."  (*Id.* ¶ 53.)  He stated that "American Driveline and Cottman's business plan ha[d] not changed since 2006."  (*Id.* ¶ 56.)

## II.

On March 17, 2016 Plaintiffs filed a complaint against Defendants premised on the deterioration of the Cottman brand since American Driveline's acquisition of AAMCO.  (ECF No. 1.)  They alleged: (1) breach of contract and the implied covenant of good faith and fair dealing against Cottman for various breaches of the License Agreement; (2) tortious interference with the License Agreements against American Driveline; (3) tortious interference in their existing and prospective business relationships against American Driveline and GPS; and (4) a claim seeking a declaration that the License Agreement is terminated and its covenant not to compete is unenforceable.  (Compl. ¶¶ 109–53.)

## A.

In support of their allegations, Plaintiffs claim that Ponton's statement in 2014 that American Driveline's business plan has not changed "is not borne out by the facts."  (*Id.*)  They

5

contend that "[p]rior to American Driveline's acquisition of AAMCO, there were more than 400 Cottman Centers across the United States and Canada.  Today, there are only 56 Cottman Centers in operation."  (*Id.* ¶ 55.)  Plaintiffs allege that "[b]y reneging on its announced strategy to re-grow the Cottman brand, Cottman has breached its obligations under Section 5(i) of the License Agreements to "continue to develop, promote and protect the good will and reputation associated with the Cottman names and marks."  (*Id.* ¶¶ 57–58, Exs. A–D.)

Plaintiffs contend that in addition to allowing the store count to decrease, Cottman has breached its obligation to promote and protect the company's goodwill under Section 5(i) in a number of other ways.  First, Cottman "gutted" Cottman's National Intercenter Warranty Program ("Warranty Program"), which is an "important tool to persuade potential customer to patronize their Cottman Centers."  (*Id.* ¶ 61.)  Plaintiffs allege that with only 56 Cottman centers, the Warranty Program "is far less valuable" than it was when Cottman had over 400 stores nationwide.  (*Id.*)

Second, Plaintiffs claim that Cottman encouraged existing and potential customers to use GPS remanufactured transmissions rather than having a Cottman center rebuild their transmission.  (*Id.* ¶ 65.)  Plaintiffs contend the cost to the franchisee of using a GPS remanufactured transmission "is significantly higher than the cost to rebuild transmissions, decreasing the franchisee's profitability."  (*Id.* ¶ 66.)  They allege that "Cottman's active participation in pirating existing and potential Cottman center customers on behalf of GPS and failing to strongly object to GPS's preferential treatment of the AAMCO brand constitutes breaches of" Section 5(i).  (*Id.* ¶ 72.)

Third, Plaintiffs contend that Cottman allowed AAMCO to "pirate" Cottman's national accounts, which "comprised a significant portion of Cottman centers' customer base and were a

significant source of revenue for franchisees." (*Id.* ¶¶ 74, 79.)  Before 2006, Cottman had between 250 and 300 national accounts under which the customers received previously negotiated rates for a franchisee's services.  (*Id.* ¶ 75.)  Cottman "no longer negotiates fixed prices with fleet and other customers," removing the account holders' incentive to patronize a Cottman center.  (*Id.* ¶ 78.)  Cottman now encourages its national account holders to "deal with AAMCO rather than Cottman."  (*Id.* ¶ 76.)

**B.**

In addition to breaching Section 5(i), Plaintiffs allege that Cottman breached its duties under six other sections of the License Agreement: Sections 5(a)–(d), (h) and Section 9.  (*Id.* ¶¶ 82–103.)  Section 5(a) provides that Cottman must assist a franchisee "in obtaining a location and negotiating a lease."  (*See, e.g.*, *id.*, Ex. A at 5.)  Plaintiffs claim that Cottman has breached this provision because it "no longer has a real estate department and franchisees are on their own when it comes to finding a new location for their center and negotiating their new lease."  (*Id.* ¶ 82.)

Section 5(b) states that Cottman must assist a franchisee "with the layout of the CENTER and the installation of equipment."  (*See, e.g.*, *id.*, Ex A at 5.)  "In the past, Cottman maintained an equipment department that would provide franchisees with a schematic drawing, based on the floor plan of the franchisee's center."  (*Id.* ¶ 84.)  Plaintiffs allege that Cottman no longer provides this service, "placing [it] in breach of its duties under Paragraph 5(b)."  (*Id.*)

Plaintiffs also claim that Cottman breached its duties under Section 5(c) to provide assistance "in finding and evaluating personnel."  (*See, e.g.*, *id.*, Ex. A at 5.)  "Cottman historically maintained a dedicated recruitment team to assist franchisees with hiring transmission rebuilders, technicians, and center managers."  (*Id.* ¶ 86.)  Plaintiffs allege that there

is now only one person at Cottman headquarters who assists with hiring for all of the franchisees. (*Id.* ¶¶ 86–87.)  They claim that this individual only "plac[es] want ads for open positions at franchise locations on CareerBuilder.com" and then forwards the responsive resumes to the franchisee "without comment."  (*Id.* ¶¶ 86–87.)  They allege that since Cottman does not provide any "meaningful assistance in finding personnel and no assistance in evaluating potential candidates, [it] is in material breach of its obligation under Paragraph 5(c)."  (*Id.* ¶ 88.)

Plaintiffs claim that Cottman has breached Section 5(d), which obligates Cottman to provide franchisees with an Operator's Manual containing "guidance in the methods, procedures and techniques of operating a [franchise]."  (*See, e.g.*, *id.*, Ex A at 5.)  Plaintiffs allege that Cottman breached this provision by failing to update its Operator's Manual after it changed its business model from having its centers provide only transmission repairs to providing general auto repairs.  (*Id.* ¶ 90.)  Although Cottman previously gave franchisees an Operator's Manual focused on transmission repairs, its current manual does not provide any "guidance on how to operate a general repair business and continues to focus solely on the operation of the transmission repair business."  (*Id.* ¶ 90.)

Similarly, Plaintiffs allege that Cottman is in breach of Section 5(h), which states that Cottman must "provide initial training and additional training programs and meetings."  (*See, e.g. id.*, Ex. A at 6.)  They claim that like Cottman's failure to update its Operator's Manual, it "has not changed the training it provides to franchises" despite asking franchisees to now offer additional repair services.  (*Id.* ¶ 93.)  Plaintiffs allege that Cottman's failure to provide an Operator's Manual and the necessary training pursuant to Sections 5(d) and (h) has caused "Plaintiffs [to be] inadequately prepared to offer customers total auto care services."  (*Id.* ¶¶ 92, 94.)

8

Lastly, Plaintiffs claim that Cottman has breached Section 9 of the License Agreement, which dictates the advertising arrangement between Cottman and the franchisees.  (*Id.* ¶¶ 95–103.)  Section 9 provides that each franchisee will pay to Cottman an annual advertising fee which Cottman will use for all of its advertising costs.  (*See, e.g. id.*, Ex. A at 8–9.)  Plaintiffs allege that Cottman has "scal[ed] back [its] advertising services to the bare bones," whereas it previously invested in large-scale advertising campaigns such as buying advertising space in trade magazines, "hiring 'personality' sponsors like Terry Bradshaw" and sponsoring a NASCAR automobile.  (*Id.* ¶ 96.)  Cottman also previously provided a different advertising agent to cover each region of Cottman centers, though it now uses one advertising agent to cover the entire nation.  (*Id.* ¶¶ 95, 97.)   Plaintiffs allege that "[w]hile Paragraph 9(c) . . . gives Cottman discretion with regard to the content and placement of advertising, Cottman does not have the discretion to discontinue providing Franchisees a level of marketing and advertising support consistent with the fees that Franchisees pay [ ] for that support."  (*Id.* ¶ 101.)  Without any "meaningful national brand advertising," they claim that they are forced to pay for their own local advertising.  (*Id.* ¶ 102.)

Plaintiffs state that each of these breaches of the License Agreement have "diminishe[d] the value of each Plaintiff's franchise on resale and result[ed] in Plaintiffs paying royalties [and advertising fees] for services Cottman refuses to provide."  (*Id.* ¶¶ 83, 84, 89, 92, 94, 103.)

## C.

Plaintiffs assert that American Driveline has tortiously interfered in the License Agreements "[b]y making the strategic decision that no resources would be invested in growing the Cottman brand, and focusing its resources on its AAMCO and GPS brands."  (*Id.* ¶ 104.)  Even though American Driveline was aware of the terms of the License Agreements between

Cottman and its franchisees, Plaintiffs allege that it "intentionally undermined the Cottman brand and materially changed the terms of the bargain contemplated by the License Agreements . . . in order to benefit itself." (*Id.*)

They further claim that American Driveline and GPS tortiously interfered in Plaintiffs' business relationships by "colluding" to convince existing and prospective Cottman customers to buy remanufactured transmissions from GPS instead of having Cottman franchisees repair their transmissions. (*Id.* ¶ 107.) Plaintiffs allege that this interference "adversely affect[ed] [their] ability to successfully carry out their daily business operations and maximize profitability." (*Id.* ¶ 108.)

Finally, they ask the Court to declare that the License Agreement is terminated and the covenant not to compete void. (*Id.* ¶¶ 141-153.) They claim that Cottman's actions "constitute fundamental breaches of the essence and purpose of the Plaintiffs' License Agreements and frustrate the purpose of these agreements." (*Id.* ¶ 143.)

### III.

On April 26, 2016 Defendants filed a motion to dismiss Plaintiffs' complaint. (ECF No. 15.) They contend that Plaintiffs' claims are based on the reduction in the number of Cottman stores, which occurred beyond the relevant statute of limitations period. (*Id.* at 4–5.) Defendants contend that even if the Court determines that the claims are not time-barred, Plaintiffs still cannot state a claim for breach of contract because, among other things, the License Agreement does not require Cottman to increase or maintain its store count. (*Id.* at 6–18.) They argue that without an underlying breach of contract, Plaintiffs' claims for tortious interference and requests for declaratory relief cannot survive. (*Id.* at 18–22.)

10

Plaintiffs argue that their claims are timely because the breaches occurred when Ponton announced American Driveline's intentions to focus its resources on AAMCO in 2014.  (Pls.' Opp. to Defs.' Mot. ("Pls.' Opp.") at 2–6, ECF No. 18.)  They contend that they have pleaded sufficient facts to demonstrate breach of contract and breach of the implied covenant of good faith and fair dealing and tortious interference against American Driveline and GPS.  (*Id.* at 8–25.)  The Court heard oral argument on the motion on June 16, 2016.  (ECF No. 22.)

**IV.**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead factual allegations sufficient "to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The "mere possibility of misconduct" is not enough.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  The court must construe the complaint in the light most favorable to the plaintiff.  *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016) (citations omitted).  A court should "consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim."  *Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d Cir. 2004).  Whether a complaint states a plausible claim for relief is a context-specific task that "requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679 (citation omitted).

Under *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps.  *See Connelly*, 809 F.3d at 787.  First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim."  *Id.* (quoting *Iqbal*, 556 U.S. at 675)  Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the

assumption of truth." *Id.* (quoting *Iqbal*, 556 U.S. at 679).  Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Id.* (quoting *Iqbal*, 556 U.S. at 679).

### V.

A plaintiff must plead the existence of three elements in order to state a claim for breach of contract under Pennsylvania law: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages.  *See Bishop v. GNC Franchising LLC*, 403 F. Supp. 2d 411, 416 (W.D. Pa. 2005), *aff'd*, 248 F. App'x 298 (3d Cir. 2007) (citing *J.F. Walker Co., Inc. v. Excalibur Oil Group,* 792 A.2d 1269, 1272 (Pa. Super. Ct. 2002)).

The court will interpret the contract as a matter of law if "the written terms of the contract are not ambiguous and can only be read one way."  *Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir. 1994) (citing *Stendardo v. Federal Nat'l Mortgage Ass'n*, 991 F.2d 1089, 1094 (3d Cir. 1993)); *see also Gene & Harvey Builders, Inc. v. Pa. Mfrs. Ass'n Ins. Co.*, 517 A.2d 910, 913 (Pa. 1986) ("Where . . .  the language of the contract is clear and unambiguous, a court is required to give effect to that language.") (citation omitted).  If, however, the contract is ambiguous, "then the interpretation of the contract is left to the factfinder, to resolve the ambiguity in light of extrinsic evidence."  *Id.* (internal citations omitted).  The test for ambiguity is whether "the words of the contract are capable of more than one objectively reasonable interpretation . . . ."  *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 76 (3d Cir. 2011).

In *Bishop*, plaintiffs were franchisees suing franchisor General Nutrition Distribution Corporation ("GNC") for, among other things, breach of contract.  403 F. Supp. 2d at 414, 416.

12

Plaintiffs claimed that GNC breached a provision in the franchise agreement that required it to "maintain high standards of quality, appearance, and service to the System."  *Id.* at 416. Specifically, they claimed that GNC manipulated its franchise system to unfairly and unlawfully benefit the company-owned stores, which competed with the non-company-owned franchisees. *Id.* at 414.  The court denied GNC's motion to dismiss for failure to state a claim holding that "in light of the liberal pleading standards of Rule 12(b)(6), this Court simply cannot say, at this early stage in the proceedings, that plaintiffs will be able to state no set of facts in support of the breach of contract claim."  *Id.*

Similarly here, the Court is unable to determine at this stage that Plaintiffs cannot state a claim for breach of contract.  The facts, when viewed in the light most favorable to Plaintiffs, demonstrate that the Cottman brand deteriorated after American Driveline acquired AAMCO.  In May 2014, Ponton disavowed the company's intentions to grow the Cottman brand and articulated American Driveline's intention to instead invest its resources in AAMCO.  Those facts, among the others alleged in the complaint, may constitute a breach of Cottman's obligation to "continue to develop, promote and protect the good will and reputation" of the brand.  (*See, e.g.* Compl., Ex. A at 6, Section 5(i)); *see also Gettinger v. Magnetic Servs., Inc.*, No. 07-cv-3015, 2008 WL 4559758, at *2 (D.N.J. Oct. 8, 2008) ("In determining the value of goodwill, there is no specific rule and each case must be considered and decided in light of its own particular facts.") (citations and internal quotation marks omitted).

Defendants argue that Plaintiffs' claim rests on an unreasonable interpretation of the License Agreement as requiring a perpetual increase in the number of Cottman stores.  (Defs.' Opp. at 7–9.)  Plaintiffs' interpretation of the License Agreement and the basis of their claim, however, is not that Cottman breached the contract by failing to perpetually increase store count,

13

but rather that Cottman failed to develop, grow and protect the company's goodwill.  *See, e.g.*

*Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555–56 (1993) (describing

"goodwill" as "the expectancy of continued patronage").  That interpretation of Section 5(i) does

not necessarily require Cottman to perpetually increase the number of centers—*i.e.*, Cottman

may satisfy its obligations to protect the brand's goodwill even if the number of stores decreases.

Whether Cottman has satisfied its obligations under this provision is not properly decided by the

Court at the motion to dismiss stage.  *See Operative Bricklayer's Union No. 64 of Pa. Welfare*

*Fund v. Bricklayer's Local Union No. 1 of Pa. Welfare Fund*, 45 F.R.D. 429, 431 (E.D. Pa.

1968) (stating that in the presence of ambiguous contractual provisions "it would be improper for

this court to interpret the contract finally in ruling upon a motion to dismiss made pursuant to

Rule 12(b)(6)").  It is instead more properly interpreted by the factfinder, *see KDH Elec. Sys.,*

*Inc. v. Curtis Tech. Ltd.*, 826 F. Supp. 2d 782, 796 (E.D. Pa. 2011) (citation omitted)), or at

summary judgment after the parties have had an opportunity to take discovery.  *See Mellon*

*Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1010 (3d Cir. 1980) ("External indicia of

the parties' intent other than written words are useful, and probably indispensable, in interpreting

contract terms."); *Butters Living Trust v. SWEPI, LP*, No. 12-cv-02010, 2013 WL 3679533, at *5

(M.D. Pa. July 12, 2013) (denying motion to dismiss and stating that the dispute may be resolved

"in the first instance only on summary judgment, where the court may consider undisputed

matters outside the pleadings") (citation omitted).

Plaintiffs have similarly stated a claim for breach of other provisions of the License

Agreements, including Sections 5(a)–(d), (h) and 9.  (Compl. ¶¶ 82–103.)  Those provisions

require Cottman to: (a) assist franchisees in obtaining and negotiating leases; (b) assist

franchisees with the layout of their stores and the installation of equipment; (c) assist franchisees

in finding and evaluating personnel; (d) give franchisees an Operator's Manual to help them operate a center; (h) provide training to the franchisees; and (Section 9) provide advertising services in exchange for a weekly advertising fee.  (*See, e.g.*, Compl., Ex. A at 5–6, 8–9, 15–16.) Cottman contends that Plaintiffs have failed to state a claim because they have merely alleged that the amount of assistance that Cottman now provides with respect to each of these terms is less than it previously provided—not that Cottman has failed to provide *any* assistance.  (Defs.' Mot. at 16.)  They interpret these provisions of the License Agreement to provide that any assistance, no matter how little, satisfies Cottman's contractual obligations.

That is not the only reasonable interpretation of those provisions.  It is reasonable to interpret Section 9, for example, as requiring Cottman to provide a certain level of advertising services—not merely requiring it to provide some advertising services.  *See Murphy v. Metro. Life Ins. Co.*, 152 F. Supp. 2d 755, 759 (E.D. Pa. 2001) (quoting *New Castle County v. Hartford Accident and Indem. Co.*, 970 F.2d 1267, 1270 (3d Cir. 1992)) ("We must interpret a contract in a common sense fashion.").  The same is true for Sections 5(a)–(d) and (h).  The Court accordingly cannot conclude that there are no set of facts upon which Plaintiffs will prevail on their breach of contract claims.[2]

## VI.

Cottman contends that even if Plaintiffs have stated a claim for breach of contract, those claims are barred by the statute of limitations.  In Pennsylvania, the statute of limitations for a breach of contract is four years.  42 Pa. Cons. Stat. § 5525(8).  "Generally speaking, the statute

---

[2]      During oral argument, Cottman contended that at no point in the complaint did the four Plaintiffs allege that Cottman specifically failed to assist them in finding a lease in violation of Section 5(a).  (Oral Arg. 29:4-16, ECF No. 22.)  Plaintiffs, however, allege that Cottman's "systemic" breaches of the various provisions of the License Agreement, including Section 5(a) "diminishes the value of each Plaintiff's franchise on resale and results in Plaintiffs paying royalties for services Cottman refuses to provide."  (*See, e.g.*, Compl. ¶ 83.)  Those allegations are sufficient to demonstrate that each alleged breach of the License Agreement, including Cottman's breach of Section 5(a), damaged each Plaintiff.

of limitations begins to run as soon as the right to institute and maintain the suit arises." *Sevast v. Kakouras*, 915 A.2d 1147, 1153 (Pa. 2007).  Cottman argues that since the parties entered into a tolling agreement on January 30, 2015, "Plaintiffs cannot assert breach of contract claims based on any alleged actions occurring before January 30, 2011."  (Defs.' Mot. at 5.)

The Federal Rules of Civil Procedure require that affirmative defenses, such as a statute of limitations defense, be pleaded in an answer rather than in a motion brought under Rule 12(b).  *See Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002).  In what has become known as the "Third Circuit Rule," however, the Third Circuit Court of Appeals has provided that a limitations defense may be raised in a Rule 12(b)(6) motion, but only if "the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." *Hanna v. U.S. Veterans' Admin. Hosp.*, 514 F.2d 1092, 1094 (3d Cir. 1975); *see Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002).  "If the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978); *Benak ex rel. All. Premier Growth Fund v. All. Capital Mgmt. L.P.*, 435 F.3d 396, 400 n.14 (3d Cir. 2006).

Here, it is not apparent on the face of the complaint that Plaintiffs' claims are barred.  The complaint chronicles the deterioration of the Cottman brand beginning with American Driveline's acquisition of AAMCO in 2006.  Plaintiffs allege that although the number of Cottman centers decreased between 2006 and 2014, Cottman made comments during that time that reflected an intention to "honor its contractual obligation" to develop and protect the goodwill of the brand.  (Pls.' Opp. at 5–6.)

In 2006, for example, "Cottman retreated from its announced position that it would phase out the Cottman brand."  (Compl. ¶ 37.)  In January 2012, Wright stated that "Cottman's goal

16

was to grow the number of Cottman centers back up to 100 within the first year," and beyond that number in new markets in subsequent years.  (*Id.* ¶ 42.)  Plaintiffs allege that Cottman "reaffirmed its commitment to regrow the Cottman brand" on a number of occasions in 2012. Specifically, Cottman reiterated that message during company conferences and newsletters, including Cottman's first and second quarter "Transmitter" newsletters, during a May 2012 Cottman National Convention and during a July 25, 2012 SPC meeting.  (*Id.* ¶ 43, Exs. F, G) Plaintiffs allege that Cottman's breach did not occur until May 2014 when Ponton stated that "no resources would be invested in growing the Cottman brand."  (*Id.* ¶¶ 51, 56.)

Plaintiffs' allegations raise a number of issues related to the accrual of their breach of contract claim, including: (1) whether Cottman repudiated the contract and then subsequently nullified that repudiation in 2006;[3] (2) whether Plaintiffs discovered or should have discovered that Cottman breached the License Agreement if such a breach occurred prior to January 30, 2011; and (3) if Cottman breached the License Agreement on the same date for all Plaintiffs, or if Cottman's breach occurred at different times due to the varying points at which each Plaintiff entered into that agreement.  Since the Court is unable to determine from the face of the complaint if any breach occurred in May 2014 or sometime prior, it is inappropriate to dismiss Plaintiffs' claims as time-barred.  *See Skold v. Galderma Labs., L.P.*, 99 F. Supp. 3d 585, 596 (E.D. Pa. 2015) (denying motion to dismiss breach of contract claim because bar was not apparent from the face of the complaint); *Alston v. Parker*, 363 F.3d 229, 233 n.6 (3d Cir.2004) (quoting *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 512 (2002) ("If more facts are necessary to

---

[3]     A party's conduct may constitute an "anticipatory breach under Pennsylvania law" if they demonstrate "an *absolute* and *unequivocal* refusal to perform or a distinct and positive statement of an inability to do so."  *Edwards v. Wyatt*, 335 F.3d 261, 272 (3d Cir. 2003) (citations and internal quotation marks omitted).  The party, however, may "nullify" that repudiation if "notification of the retraction comes to the attention of the injured party before he materially changes his position in reliance on the repudiation or indicates to the other party that he considers the repudiation to be final."  *Id.* (citing Restatement (Second) of Contracts § 256).

resolve or clarify the disputed issues, the parties may avail themselves of the civil discovery

mechanisms under the Federal Rules.").

## VII.

Plaintiffs allege that Cottman also breached the implied covenant of good faith and fair

dealing.  (Compl. ¶¶ 57–103.)  The Third Circuit has stated that Courts use the duty of good faith

and fair dealing "as an interpretive tool to determine the parties' justifiable expectations in the

context of a breach of contract action."  *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227

F.3d 78, 91 (3d Cir. 2000) (citations omitted).  That duty, however, "is not divorced from the

specific clauses of the contract and cannot be used to override an express contractual term."  *Id.*

In *Northview Motors, Inc.*, the Third Circuit held that "[a] party is not entitled to maintain

an implied duty of good faith claim where the allegations of bad faith are identical to a claim for

relief under an established cause of action."  *Id.* at 91–92 (citation and internal quotation marks

omitted).  The court stated that "[i]f construed too broadly, the doctrine could become an all-

embracing statement of the parties' obligations under contract law, imposing unintended

obligations upon parties and destroying the mutual benefits created by legally binding

agreements."  *Id.* at 92.  Accordingly, a plaintiff cannot maintain an action for breach of the

implied covenant of good faith and fair dealing where an "adequate remedy exists under . . . [a]

claim for breach of contract."  *Geesey v. CitiMortgage, Inc.*, 135 F. Supp. 3d 332, 346 (W.D. Pa.

2015); *see also Hudgins v. Travelers Home and Marine Ins. Co.*, No. 11-cv-882, 2013 WL

3949208, at *5 (E.D. Pa. July 31, 2013) ("[T]he claim for breach of the implied covenant of good

faith and fair dealing is subsumed by the breach of contract claim"); *Cummings v. Allstate Ins.

Co.*, 832 F. Supp. 2d 469, 473 (E.D. Pa. 2011) ("[A] breach of the covenant of good faith is

nothing more than a breach of contract claim and . . . separate causes of action cannot be

maintained for each, even in the alternative") (citation and internal quotation marks omitted);

*McHale v. NuEnergy Group*, No. 01-cv-4111, 2002 WL 321797, at *8 (E.D. Pa. Feb. 27, 2002)

(dismissing breach of implied covenant of good faith and fair dealing claim because "the actions

forming the basis of the breach of contract claim are essentially the same as the actions forming

the basis of the bad faith claim") (citations omitted).

Here, Plaintiffs rely on the same facts to support their breach of the implied covenant of

good faith and fair dealing claim and their breach of contract claim.  (Compl. ¶¶ 57–103.)  They

do not articulate any breach of an implied covenant separate from a breach of a specific

provision of the License Agreement.  For example, they allege that "Cottman has breached its

contractual obligations by . . .  terminating Plaintiffs' License Agreements without good cause in

breach of Section 19 of the License Agreements and the implied covenant of good faith and fair

dealing."  (*Id.* ¶ 118.)  They similarly tie their claim for breaches of the implied covenant of good

faith and fair dealing to the alleged breaches of Sections 5(a)–(d), (h)–(i) and 9.  (*Id.* ¶¶ 57–103.)

Since Plaintiffs rely on the same facts to support both claims and since they have an adequate

remedy under a breach of contract claim, they cannot state a claim for breach of the implied

covenant of good faith and fair dealing.[4]

---

[4]       Defendants contend that Plaintiffs' claim for breach of the implied duty of good faith and fair dealing
should also be dismissed because "[n]either the Pennsylvania Supreme Court nor the Third Circuit Court of Appeals
has ever applied [this covenant] to the franchise relationship outside the context of termination."  (Defs.' Mot. at
11.)  "The precise contours of the good faith duty in the franchise relationship have not been established by the
Pennsylvania Supreme Court."  *Cottman Transmission Sys., LLC v. Kershner*, 536 F. Supp. 2d 543, 555–56 (E.D.
Pa. 2008).  Some courts predict that the Pennsylvania Supreme Court would limit the duty to the termination
context, *see Bishop*, 403 F. Supp. 2d at 419; *GNC Franchising, LLC v. Farid*, 2006 WL 1878925, at *4 (W.D. Pa.
July 6, 2006); others predict that the duty would be extended to all aspects of the franchise relationship.  *See
AAMCO Transmissions, Inc. v. Harris*, 759 F. Supp. 1141, 1148–49 (E.D. Pa. 1991) ("[I]t seems unlikely that the
Pennsylvania appellate courts will limit the franchisor's implied duty to deal in good faith to situations of franchise
terminations").  The Court need not analyze or speculate if Pennsylvania law recognizes an implied duty outside the
termination context since Plaintiffs cannot state a claim for breach of the covenant in any event.

**VIII.**

Plaintiffs allege that American Driveline tortiously interfered with the License Agreement between Cottman and Plaintiffs, and that both American Driveline and GPS tortiously interfered with Plaintiffs' existing and prospective business relationships.  (*Id.* ¶¶ 121–140.)  Specifically, they claim that American Driveline tortiously interfered with the License Agreement "by adopting a strategy to discontinue all support for the Cottman franchise system, effectively preventing Cottman from carrying out its contractual duties."  (*Id.* ¶ 125.)  They allege that American Driveline and GPS tortiously interfered with their existing and prospective business relationships by "convinc[ing] . . . customers to buy remanufactured transmissions from GPS rather than have their transmissions repaired at a Plaintiffs' Cottman center[]."  (*Id.* ¶ 136.) Defendants contend that the Court should dismiss the claims for tortious interference because Plaintiffs cannot state a claim for an underlying breach of contract.  (Defs.' Mot. at 18.)  They argue that even if Plaintiffs can state a claim for breach of contract, American Driveline's alleged interference is "privileged or justified because such actions are in the interest of protecting its corporate assets."  (*Id.* at 19.)

**A.**

Under Pennsylvania law, to state a claim for intentional interference with contractual or prospective contractual relations, a plaintiff must show: "(1) the existence of a contractual [or prospective contractual] relationship; (2) an intent on the part of the defendant to harm the plaintiff by interfering with those contractual relations; (3) the absence of privilege or justification for the interference; and (4) actual damages resulting from the defendant's conduct." *Schulman v. J.P. Morgan Inv. Mgmt.*, 35 F.3d 799, 807 n.14 (3d Cir. 1994) (citing *Neish v. Beaver Newspapers, Inc.*, 581 A.2d 619, 625 (Pa. Super. Ct. 1990)).  The Plaintiff must prove

20

each element, including the absence of a privilege.  *See Bahleda v. Hankinson Corp.*, 323 A.2d 121, 122–23 (Pa. Super. Ct. 1974).  The second prong requiring that plaintiff articulate an "intent to harm" requires only an intention to interfere with the contract or contractual relation, "and not malevolent spite by the defendant."  *Yaindl v. Ingersoll–Rand Co.*, 422 A.2d 611, 622 n.11 (Pa. Super. Ct. 1980).

"Unlike other intentional torts such as intentional injury to person or property, or defamation, there is no crystallized set of definite rules as to the existence or nonexistence of a privilege to interfere with contracts."  *PSC Info Grp. v. Lason, Inc.*, 681 F. Supp. 2d 577, 593 (E.D. Pa. 2010) (quoting Restatement (Second) of Torts § 767 cmt. b (1979)) (internal quotation marks omitted).  The Restatement analyzes the issue of privilege or justification in terms of whether the defendant's act was "improper . . . rather than in terms of whether there was a specific privilege to act in the manner specified."  *Id.* (citations and internal quotation marks omitted).  The following factors are relevant to whether interference is improper:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

*Id.* (citing Restatement (Second) of Torts § 767 cmt. b); *see also Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 393 A.2d 1175, 1184 (Pa. 1978) (following Section 767 of the Restatement). The inquiry into whether the privilege exists is fact intensive: "The court must evaluate the issue of propriety 'for the precise facts of the case before the court; and, as in the determination of whether conduct is negligent, [the outcome] is usually not controlling in another factual situation.'"  (*Id.* (citing Restatement (Second) of Torts § 767 cmt. b)).

21

The justification for recognizing a parent's privilege is, in part, to protect the parent's "interest in the financial stability of its subsidiary." *Advent Systems Ltd. V. Unisys Corp.*, 925 F.2d 670, 673 (3d Cir. 1991.)  The Third Circuit has stated that the privilege exists, for example, in situations where the parent interferes to prevent "the dissipation of the resources of their wholly-owned subsidiary." *Green v. Interstate United Mgmt. Servs. Corp.*, 748 F.2d 827 (3d Cir. 1984).  As noted by the Third Circuit, however, Pennsylvania has "embraced a narrower version of the corporate parent privilege." *Nat'l Data Payment Systems, Inc.*, 212 F.3d at 857 (citing *Shared Comm. Servs. of 1800–80 JFK Boulevard, Inc. v. Bell Atlantic Properties, Inc.*, 692 A.2d 570 (Pa. Super. Ct. 1997)).  In *Shared Communications*, the court distinguished situations in which the parent interfered in order to prevent the waste of the subsidiary's assets— which the privilege protects—and situations where the parent interferes in order "to help aggrandize [itself]," which the privilege does not protect.  692 A.2d at 575.  The court specifically distinguished *Advent* and *Green*—which American Driveline and GPS rely upon in their motion—that involved a parent interfering to prevent dissipation of the subsidiary's assets, from the situation of a parent interfering to benefit "a corporate sibling" of the subsidiary.  *Id.* (quotation marks omitted).

The facts alleged in the complaint, when viewed in the light most favorable to Plaintiffs, suggest that American Driveline's conduct was not motivated by a desire to protect Cottman's assets.  Rather, the allegations demonstrate that American Driveline was driven by an interest in aggrandizing itself through the growth of Cottman's "corporate sibling," AAMCO.  *See id*; *see also Gerstadt v. Lehigh Valley Infectious Disease Specialists*, 2009 WL 839092, at *5 (E.D. Pa. Mar. 30, 2009) (denying motion to dismiss tortious interference claims because plaintiff alleged sufficient facts to demonstrate that the interference was improper).  Similarly, the factors listed in

22

Section 767 of the Restatement (Second) dictate that dismissing Plaintiffs' tortious interference claim as privileged at this stage would be inappropriate. *See PSC Info. Grp*, 681 F. Supp. 2d at 597 (denying defendant's motion for summary judgment on issue of privilege because "reasonable minds could differ as to whether [defendant's] interference with the contract was proper").

**B.**

Plaintiffs have also stated a claim for tortious interference with existing and prospective business relationships against American Driveline and GPS.   To state such a claim, Plaintiffs must plead the elements of a traditional tortious interference claim, plus additional facts to show "an objectively reasonable probability that [prospective relationships would] come into existence." *Fresh Made, Inc. v. Lifeway Foods, Inc*., No. 01-cv-4254, 2002 WL 31246922, at *12 (E.D. Pa. Aug. 9, 2002).

Plaintiffs allege that American Driveline and GPS "colluded" with each other to "convince [existing and prospective] customers to buy remanufactured transmissions from GPS rather than have their transmissions repaired at Plaintiffs' Cottman centers."  (Compl. ¶ 107.) They allege that certain individuals working on behalf of American Driveline and GPS "actively solicited . . . Plaintiffs' existing and prospective fleet customers" to buy GPS transmissions.  (*Id.* ¶ 136.)  Aside from contending that American Driveline is privileged from claims of tortious interference, Defendants do not argue that those allegations are insufficient to state a claim against American Driveline or GPS for tortious interference with existing or prospective business

23

relationships.  (Defs.' Mot. at 18–20.)  The Court accordingly declines to dismiss those claims at this stage.[5]

## IX.

Plaintiffs allege claims for declaratory relief in their complaint, asking the Court to: (1) terminate the License Agreement; and (2) declare the post-termination covenant not to compete unenforceable.  (Compl. ¶¶ 141-53.)  Defendants argue that the Court should dismiss these claims because there is no breach of the License Agreement and the request to terminate the non-compete clause is premature.  (Defs.' Mot. at 20-22.)

Since Plaintiffs have stated a claim for breach of contract, their claim for declaratory relief to terminate the contract may proceed.  *See Chon An v. Kwon*, No. 03-cv-1836, 2004 WL 1091041, at *3 (E.D. Pa. May 13, 2004) (stating that a party may rescind the contract where it "has suffered a breach so material and substantial in nature that it affects the very essence of the contract and serves to defeat the objective of the parties") (citation omitted).  When viewing the facts in the light most favorable to Plaintiffs, the Court cannot conclude as a matter of law that any breaches of the License Agreement were not sufficiently material to warrant rescission.

Pennsylvania courts generally disfavor mandating compliance with a covenant not to compete and must weigh it against the franchisor's legitimate business interests.  *AAMCO Transmissions v. Romano*, 2016 WL 792498, at *4-5 (E.D. Pa. Mar. 1, 2016) (citing *Victaulic*, 499 F.3d at 235).  Pennsylvania courts "will permit the equitable enforcement of a covenant not to compete included in a franchise agreement where the restrictions are reasonably necessary for

---

[5]    Under Pennsylvania law, the statute of limitations for tortious interference claims is two years.  42 Pa. Cons. Stat. § 5524(3); *see also Elliott Reihner Siedzikowski & Egan, P.C. v. Pa. Emps. Benefit Trust Fund*, 29 F. App'x 838, 842 (3d Cir. 2002).  For the reasons discussed *supra*, the Court cannot determine from the face of the complaint whether Plaintiffs' claim for tortious interference occurred in May 2014 or sometime before.  When viewing the facts in the light most favorable to Plaintiffs, the accrual of their tortious interference claim occurred within two years of the January 30, 2015 tolling agreement.  The Court is accordingly unable to dismiss those claims as time-barred at this stage.

the protection of the franchisor without imposing undue hardship on the franchisee and the restrictions are reasonably limited as to duration of time and geographical extent." *Piercing Pagoda, Inc. v. Hoffner*, 351 A.2d 207, 212 (1976).  The Third Circuit has stated that this is a "fact-intensive inquiry" and "should not be determined on the pleadings unless" the Court can make a reasonableness determination from the allegations in the complaint.  *AAMCO Transmissions, Inc. v. Romano*, 42 F. Supp. 3d 700, 711 (E.D. Pa. 2014) (citing *Victaulic Co. v. Tieman*, 499 F.3d 227, 234–35 (3d Cir.2007)).

The Court is unable to determine based upon the facts alleged in the complaint that the covenant not to compete is reasonably limited.  Further, Plaintiffs do not have to wait until the License Agreements have been terminated before seeking declaratory relief.  (*See* Defs.' Mot. at 21.)  The Declaratory Judgments Act provides that if "there is an actual controversy between the parties," the Court may "settle the parties' respective rights, even before there is a . . . breach of duty."  *In re 400 Walnut Associates, L.P.*, 454 B.R. 60, 74 (Bankr. E.D. Pa. 2011) (citation omitted).  "A declaratory judgment may well be appropriate in the context of a contract dispute even before an actual breach of the contract occurs."  *Id.*  (citation omitted).  Since there is a justiciable controversy between the parties pursuant to the Declaratory Judgments Act, 28 U.S.C. § 2201, Plaintiffs may seek declaratory relief even if they have not yet been terminated.

An appropriate Order follows.

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.